**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Large,<br><br>        Plaintiff,<br><br>vs.<br><br>Steven Hilton,<br><br>        Defendant. | No. CV-11-1127-PHX-GMS<br><br>**ORDER** |

Pending before the Court are Defendant's Motion to Dismiss the Amended Complaint in Part and Plaintiff's Motion for Judicial Estoppel. (Docs. 39, 44). For the reasons stated below, the motion to dismiss is granted in part and denied in part, and the motion for judicial estoppel is denied.

**BACKGROUND**

According to the complaint, Defendant hired Plaintiff to work as a landscaper, vehicle detailer, and private driver on April 2, 2007. (Doc. 38 ¶¶ 7–8). In March of 2007, Defendant contacted Plaintiff, who was working as a driver for ExecuCar of Phoenix, and asked him to work on Defendant's house in Scottsdale, Arizona. (*Id.* ¶¶ 17–18). In his position at ExecuCar, Plaintiff had access to a Lincoln Town Car owned by his employer. While negotiating for the new position, Defendant stated that he would purchase a Cadillac ESV as a company vehicle for Plaintiff to use to drive to work and to drive Defendant. (*Id.* ¶¶ 19–20). On March 31, the parties agreed that Plaintiff would be paid $42,500 a year for his

1    work, which would be based on a 40-hour work week. (*Id.* ¶ 21). Plaintiff's previous
2    employer asked him to return the Town Car on April 13, and on April 14 began to look for
3    a Cadillac ESV to use as a company car. (*Id.* at 26–27). On April 23, 2007, Defendant told
4    Plaintiff that he no longer wished to purchase a company car, but would instead loan Plaintiff
5    money to purchase a truck. (Doc. 38 ¶ 29). Defendant gave Plaintiff a $20,000 check, and
6    Plaintiff purchased a truck for $17,900 on April 26. Plaintiff contends that Defendant
7    represented that he would withhold $300 per month from Plaintiff's salary in repayment of
8    the loan. In fact, Defendant deducted $150 each two-week pay period from Plaintiff's pay.
9    Plaintiff contends that this process resulted in $450 being deducted from his pay during a
10   number of months that contained three paydays. (*Id.* at 33–36).

11   According to the complaint, Defendant regularly demanded that Plaintiff work more
12   than 40 hours in a week, and never paid overtime. (*Id.* ¶¶ 37, 39–44). Plaintiff was also
13   asked, during the course of his employment, to reconstruct Defendant's 8,000 square foot
14   home in Utah in 2009, work that had not been contemplated in the original agreement. (*Id.*
15   ¶ 39, 42). At one point during the reconstruction of the house, Plaintiff worked 111 hours
16   over eight straight days, and at another point he worked for four weekends in a row. (Doc.
17   38 ¶ 42; Doc. 38-1, Ex. R). Plaintiff was never paid any overtime for this work or his work
18   in Arizona. On one occasion, when Plaintiff emailed Defendant a list of completed tasks and
19   noted that some requested items had not been finished before the end of the day, Defendant
20   responded by writing "Do the items I ask you to do before you leave for the day. Period!"
21   (Doc. 38-1, Ex. E).

22   On January 5, 2010, Plaintiff sent Defendant an email in which he detailed the work
23   he had done that day, including the fact that he had cleaned the inside of the upper patio light
24   fixtures while standing alone on a twelve-foot ladder. Plaintiff stated that he did not believe
25   that standing on the ladder without a spotter was safe, and requested that for his safety,
26   someone serve as a spotter the next time he was required to clean the fixtures. (Doc. 38-1,
27   Ex. G). Defendant responded with an email that read, in total, "No one likes a smart ass.
28

- 2 -

1  Maybe we should discuss ending our relationship tomorrow. I think I am at the end of my
2  rope with your attitude." (*Id.*).
3        On March 2, 2010, Defendant sent Plaintiff an email, apparently in response to
4  Plaintiff's request Defendant reimburse him for fuel purchased for the truck and for the costs
5  of a cell phone. The email states that Plaintiff may purchase one tank of gas for the truck
6  each month and no more, that having a personal phone is a condition of employment, and that
7  "[t]he fact that you would take the time to send this long and detailed e-mail on work time
8  is disturbing." (Doc. 38-1, Ex. L). The first line of Defendant's response is "This e-mail goes
9  into the category of 'you got to be kidding.'" (*Id.*). On March 21, 2010, Plaintiff sent
10 Defendant an email detailing the history of how he was hired, the facts that he had never
11 been paid overtime and had never received a raise, the fact that because he was salaried, he
12 had earned less per hour than the hourly workers who had been hired to help him in Utah,
13 and the fact that he had been asked to do much more than the landscaping, detailing, and
14 driving for which he had originally been hired. (Doc. 38-1, Ex. H). At some point between
15 the date Plaintiff sent this email and October 6, 2010, Defendant fired him. (Doc. 38 ¶ 47).[1]
16 After he was fired, Plaintiff asked whether Defendant would be paying him for unused
17 vacation so that he could accurately report to the Arizona Department of Economic Security
18 whether he had received such funds. Plaintiff wrote back "I don't owe you any vacation. Not
19 sure what you're talking about." (Doc. 38-1, Ex. P). Nevertheless, Defendant reported to the
20 Department of Economic Security that he had paid Plaintiff $980.64 in "unused vacation,
21 holiday, sick pay, or . . . severance or dismissal pay," which Plaintiff states he never received.
22 (Doc. 38-1, Ex. N). Plaintiff was denied unemployment insurance as a result. (*Id.*).

---

[1] Elsewhere, Plaintiff states that the reason he was terminated was that he had refused to take apart shower valves in the master shower, because doing so would void a contractor's warranty and leave Plaintiff liable for subsequent damages. He claims that the Defendant "did not dispute this as the reason I was fired." (Doc. 34 at 4). The reason for Plaintiff's termination does not, however, appear to be an issue in this lawsuit.

1  Plaintiff began to look for new work through an employment placement group. On
2 March 11, 2011, Plaintiff signed a confidentiality agreement in connection with contemplated
3 work as a vehicle and landscape House Manager for another local businessman. (Doc. 38-1,
4 Ex. Q). On April 25, 2011, when a representative of the employment placement group
5 contacted the other local businessman to ask about Plaintiff's start date, the businessman told
6 him, "The Hiltons say he hurt one of their children and I don't trust him around my son."
7 (Doc. 38 ¶ 50). In an email two days later, Plaintiff describes the allegation by writing that
8 "nobody is going to accuse me of a sex crime against children." (Doc. 38-1, Ex. S). Plaintiff
9 never obtained the new position.

10  At some point, Plaintiff had brought an action through the United States Department
11 of Labor ("DOL"); he rejected a settlement offer before May 1, 2011. (Doc. 38-1, Ex. O). It
12 is not clear from the record whether the DOL settlement had been offered or rejected before
13 the interaction regarding the potential new job. On May 1, 2011, Defendant sent a letter to
14 Plaintiff stating that he had contacted a lawyer and believed that he could obtain a judgment
15 for the $9,200 remaining on the original truck loan. (Doc. 38-1, Ex. O).

16  Plaintiff filed a sixteen-claim complaint on June 6, 2011. (Doc. 1). Plaintiff was
17 granted leave to amend the complaint and filed an amended complaint on November 3, 2011.
18 The complaint alleges ten causes of action, as follows: 1) Violation of the Fair Labor
19 Standards Act ("FLSA") for failing to pay overtime, 2) Failure to Reimburse Expenses, 3)
20 Unpaid Vacation Pay, 4) Failure to Pay Due Wages Within Three Days, 5) Theft of Services
21 in Arizona and Utah, 6) Fraud, 7) Aiding and Abetting; Intentional Tort, 8) Blacklisting, 9)
22 Defamation by Slander Per Se, and 10) Intentional Infliction of Emotional Distress. (Doc.
23 38 ¶¶ 61–198).

24  Defendant has moved to dismiss Claim 3 and Claims 5–10. (Doc. 39).

**DISCUSSION**

**I.  Legal Standard**

27  To survive dismissal for failure to state a claim pursuant to Federal Rule of Civil

- 4 -

1  Procedure 12(b)(6), a complaint must contain more than "labels and conclusions" or a
2  "formulaic recitation of the elements of a cause of action"; it must contain factual allegations
3  sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*,
4  550 U.S. 544, 555 (2007). While "a complaint need not contain detailed factual allegations
5  . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'"
6  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Twombly*,
7  550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content
8  that allows the court to draw the reasonable inference that the defendant is liable for the
9  misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550
10 U.S. at 556). The plausibility standard "asks for more than a sheer possibility that a defendant
11 has acted unlawfully." When a complaint does not "permit the court to infer more than the
12 mere possibility of misconduct, the complaint has alleged—but it has not shown—that the
13 pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1950 (internal quotation omitted).

14 When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll
15 allegations of material fact are taken as true and construed in the light most favorable to the
16 nonmoving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). However, legal
17 conclusions couched as factual allegations are not given a presumption of truthfulness, and
18 "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a
19 motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

20 The Court considers the pleadings of pro se litigants liberally. *See Hughes v. Rowe*,
21 449 U.S. 5, 9 (1980) ("It is settled law that the allegations of [a pro se plaintiff's] complaint,
22 'however inartfully pleaded' are held 'to less stringent standards than formal pleadings
23 drafted by lawyers.'") (citations omitted); *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir.
24 1986) ("[W]e hold [plaintiff's] pro se pleadings to a less stringent standard than formal
25 pleadings prepared by lawyers."). Nevertheless, "[a]lthough [the Court] construe[s] pleadings
26 liberally in their favor, pro se litigants are bound by the rules of procedure." *Ghazali v.*
27 *Moran*, 46 F.3d 52, 54 (9th Cir. 1995) (citing *King v. Atiyeh*, 814 F.2d 565, 567

28

(9th Cir. 1987)).

## II. Analysis

Defendant alleges that Plaintiff has failed to state a claim, has not complied with the applicable statutes of limitations, or has brought claims pursuant to statutes that provide no private right of action. The claims that Defendant seeks to dismiss will be discussed in turn.

### A. Claim Three—Vacation Pay

Plaintiff claims that Defendant failed to pay him for accrued vacation days. (Doc. 38 ¶¶ 74–81). Employers are liable for wages, including vacation pay "when the employer has a policy or a practice of making such payments." Arizona Revised Statutes ("A.R.S.") § 23-350. In Arizona, an employer may stipulate in a contract that vacation time must be used or lost at the termination of employment. Including such a "use-it-or-lose-it" provision "is legal if the employee knows or should have known of the policy since the policy becomes part of the employment contract." AZ Atty. General Op. I80-120 (Jun. 26, 1980 at 2). Unless an employee knows or should have known that he was working under a "use-it-or-lose-it" contract, "[i]f the employee is unable to use the leave time for various reasons, he is entitled to compensation for the unused leave time." *Id.* Plaintiff alleges that he understood himself to be working under a contract where he was entitled to ten compensated vacation days each year because he was paid for that leave time during the first three years of his employment. It appears that Plaintiff was working under a verbal agreement that neither stated nor denied that his vacation days would expire if he did not use them. Taking all allegations in the complaint as true, it does not appear that Plaintiff knew or should have known that he would lose any unused vacation time upon termination. The fact that Defendant reported to the Department of Economic Security that he had paid Plaintiff for accrued vacation time, when in fact he had not, further suggests that a reasonable person would have understood that accrued vacation pay was due. (Doc. 38-1, Ex. N). Claim Three survives the motion to dismiss.

### B.     Claim Five—Theft of Services

Plaintiff claims that failure to pay overtime qualified as a theft of services under A.R.S. § 13-1801, and seeks unpaid hourly wages from March 2, 2007 through June 5, 2009. Plaintiff acknowledges that he has included this claim, and only seeks recovery through June 5, 2009, because he believes that the two-year statute of limitations in the FLSA will preclude his recovery of any unpaid overtime accrued before June 6, 2009, two years before he filed this suit. (Doc. 38 ¶¶ 89–90).[2] The key inquiry in determining whether a court may find an implied private right of action is whether the legislature "displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Arizona courts interpreting whether criminal laws create private rights of action consider "the context of the statutes, the language used, the subject matter, the effects and consequences, and the spirit and purpose of the law." *Transamerica Financial Corp. v. Superior Court of the State of Arizona*, 158 Ariz. 115, 117, 761 P.2d 1019, 1021 (1988). Here, Plaintiff has pointed to no authority suggesting that the Arizona legislature intended to create a private right of action in its criminal theft statute, and the Court has found no such authority. Plaintiff cites to *Estate of Kirschenbaum v. Kirschenbaum*, 164 Ariz. 435, 439, 793 P.2d 1102, 1106 (App. 1989). *Kirschenbaum* was filed under Arizona's racketeering statutes, A.R.S. §§ 13-2301–04, which do grant a private right of action. The plaintiffs in *Kirschenbaum* had alleged that parties had violated the racketeering scheme by engaging in a fraudulent scheme that involved violation of the theft statutes. 164 Ariz. at 439. The case did not rely upon the theft statutes themselves for a private cause of action, and Plaintiff has not based his claim on the racketeering statutes. There is no private right of action conferred by A.R.S. § 13-1801, and Claim Five is therefore dismissed.

---

[2] A cause of action "arising out of a willful violation" of the FLSA is subject to a three-year, rather than a two-year, statute of limitations. 29 U.S.C. § 255(a).

- 7 -

**C.  Claim Six—Fraud**

Plaintiff alleges that on March 31, 2007, Defendant promised Plaintiff that Defendant would purchase a company car for Plaintiff's use if Plaintiff came to work for Defendant, even though Defendant did not in fact intend to purchase a company car. (Doc. 38 ¶¶ 99–104). Plaintiff believed this statement to be true and relied upon it when he left his then-current job, and thereby suffered damages by entering an employment situation that was less advantageous than the one he had left. (Doc. 38 ¶¶ 105–112). Although the complaint thereby states a fraud claim sufficient to meet the heightened pleading standards of Rule 9(b), fraud claims in Arizona are subject to a three-year statute of limitations. A.R.S. § 12-543(3). According to the complaint, Defendant stated that he would be loaning money for a truck instead of purchasing a car on April 23, 2007, which is therefore the latest date on which Plaintiff "discover[ed] or with reasonable diligence could have discovered the fraud." *Mister Donut of America, Inc. v. Harris*, 150 Ariz. 321, 323, 723 P.2d 670, 672 (1986). The fraud claim accrued no later than April 23, 2007, and expired on April 23, 2010, over a year before Plaintiff filed this lawsuit. Plaintiff claims that he did not discover the fraud until he went through his previous emails after Defendant told a potential employer that Plaintiff had harmed Plaintiff's children. The fraud claim did not accrue when Plaintiff in fact discovered the underlying facts, but when he could have discovered them with "reasonable diligence." *Mister Donut*, 150 Ariz. at 323. The statute of limitations on Plaintiff's fraud claim has expired.

Plaintiff includes under his fraud claim allegations regarding the deductions used to repay the truck loan. Plaintiff was aware that Defendant was deducting $150 with every paycheck, rather than $300 per month, no later than October 1, 2007, when Plaintiff was notified by email of the change. The statute of limitations on a claim that Defendant had promised some other means or amount of withholding expired on October 1, 2010, more than six months before this suit was filed. Claim Six is dismissed.

### D. Claim Seven—Aiding and Abetting

Plaintiff alleges that Defendant aided and abetted Defendant's spouse, Suzanne Hilton, in tortious conduct by helping her withhold $150 every pay period, rather than $300 per month, from Defendant's pay. As a result, Defendant claims that during months that covered three pay periods, his pay was reduced by $450, rather than $300. (Doc. 38 ¶¶ 120–134). Construing Plaintiff's pleadings generously, as the Court must given Plaintiff's pro-se status, this claim is in fact a breach of contract claim in which Plaintiff alleges that Defendant violated the terms of an oral agreement, entered into on October 1 of 2007, to withhold $300 per month as repayment of the loan for the truck. (Doc. 38 ¶ 36). Plaintiff received an email that day that in fact $150 would be withdrawn every pay period. (Doc. 38-1, Ex. D). The very latest he could have known that $450 would be withheld during months with three paydays was November of 2007, the first month in which $450 was withheld from Plaintiff's pay in a single month. (Doc. 38 ¶ 126). The statute of limitations for an oral contract is three years, and the clam expired, at the latest, at the end of November 2010. A.R.S. § 12-543(1). Claim Seven is dismissed.

### E. Claim Eight—Blacklisting

A person commits blacklisting in Arizona "if he knowingly exchanges, solicits or gives out any labor blacklist." A.R.S. § 23-1362(A). A labor blacklist is defined as "any understanding or agreement whereby the names of any person or persons, list of names, descriptions or other means of identification shall be spoken, written, printed or implied for the purpose of being communicated or transmitted between two or more employers of labor . . . whereby the laborer is prevented or prohibited from engaging in a useful occupation." A.R.S. § 12-1361(A). When a former employer reports to a potential employer on the reason that an employee was terminated, a presumption of good faith protects the former employer from violating the blacklisting law, and this presumption can only be rebutted by "showing that the employer disclosed the information with actual malice or with intent to mislead." A.R.S. § 23-1361(D).

1      Defendants argue that the blacklisting claim must be dismissed because Плaintiff fails
2 to allege that Defendant made a "direct statement to any of Plaintiff's prospective
3 employers." (Doc. 39 at 10). Plaintiff discusses the allegation that Defendant told a potential
4 employer that Defendant had harmed one of Plaintiff's children in multiple parts of the
5 complaint. It is true that in one section, Plaintiff writes that the potential employer "had heard
6 from a connection to [Defendant] that the Plaintiff was not to be trusted and that I had
7 committed a crime against one of the Defendant's children." (Doc. 38 ¶ 138). Elsewhere,
8 however, he writes that the potential employer reported that "The [Defendant] say[s] he hurt
9 one of [his] children and I don't trust him around my son." (Doc. 38 ¶ 50). Although this
10 second-hand report would be inadmissible at trial in its current form, for the purposes of a
11 motion to dismiss, Plaintiff has alleged that Defendant told Plaintiff's potential employer that
12 Plaintiff had harmed one of Defendant's children, and that Defendant made this statement,
13 knowing it was false, to prevent Plaintiff from obtaining employment. Such a statement
14 would be one through which "the laborer is prevented or prohibited from engaging in a useful
15 occupation," and would rebut the presumption of good faith. A.R.S. § 12-1361(A).

16      Defendants further rely on *Longariello v. Phoenix Union High School Dist.*, 09-CV-
17 1606 (LOA), 2009 WL 4827014, at *6 (Dec. 15, 2009), a case in which the complaint made
18 "no allegation that Defendant took any action to prevent Plaintiff from engaging in any other
19 employment or occupation." The instant complaint makes such an allegation, and
20 *Longariello* is not applicable. Claim Eight survives Defendant's motion.

21      **F.    Claim Nine—Defamation**

22      To state a claim for defamation, a plaintiff must allege "the publication to a third
23 party, of a false, defamatory statement of and concerning the plaintiff that is not privileged."
24 *Spratt v. Northern Automotive Corp.*, 958 F. Supp. 456, 465 (D. Ariz. 1996). Once again
25 relying on one description of the allegation, Defendant argues that Plaintiff has not alleged
26 who made the statement or to whom the person made the statement, and that the allegation
27 therefore fails to meet the plausibility standard of *Iqbal*. (Doc. 39 at 10). Plaintiff writes that

28

1  on March 25, 2011, his employment agency contacted an employer who had agreed to hire
2  Plaintiff, and the potential employer told the agency: "[Plaintiff] is tainted. [Defendant]
3  say[s] he hurt one of [his] children and I don't trust him around my son." (Doc. 38 ¶ 50).
4  Plaintiff attaches the March 11, 2011 confidentiality agreement, an email he sent to the
5  employment agency on March 25, 2011 in an effort to "defend myself as this COMPLETE
6  LIE is costing me a job I really wanted," (Doc. 38-1, Ex. S) (emphasis in original) and an
7  email from March 27 to a friend in which he writes that "nobody is going to accuse me of a
8  sex crime against children." (Doc. 38-1, Ex. U). The allegation in the complaint does not
9  detail the particular "hurt" that Defendant alleged, and as noted above the statement would
10 not be admissible in its current form. For the purposes of a motion to dismiss, however, the
11 statement, combined with the contemporary documentation, adequately states a claim for
12 defamation that "plausibly suggest[s] an entitlement for relief." *Iqbal*, 129 S. Ct. at 1951.
13      In his motion, Defendant does not argue the statement was privileged or provide any
14 other defense. The motion to dismiss Claim Nine is denied.

15      **G.    Claim Ten—Intentional Infliction of Emotional Distress**

16      To state an IIED claim, Plaintiffs must allege that "the defendant's acts are so
17 outrageous in character and so extreme in degree as to go beyond all possible bounds of
18 decency, and to be regarded as atrocious and utterly intolerable in a civilized community."
19 *Patton v. First Fed. Sav. and Loan Ass'n of Phoenix*, 118 Ariz. 473, 476, 578 P.2d 152, 155
20 (1978). "It is extremely rare to find conduct in the employment context that will rise to the
21 level of outrageousness necessary to provide a basis for recovery for the tort of intentional
22 infliction of emotional distress." *Mintz v. Bell Atl. Sys. Leasing Int'l*, 183 Ariz. 550, 554, 905
23 P.2d. 559, 563 (App. 1995) (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.
24 1988)). Much of Plaintiff's IIED claim concerns employment issues covered by other
25 claims—for example, Plaintiff claims that Defendant was verbally abusive, threatened to fire
26 Plaintiff when Plaintiff brought up safety concerns, and forced him to work without overtime.
27 Although this behavior may lead to liability, it is not "regarded as atrocious and utterly
28

- 11 -

1   intolerable in a civilized community" and will not give rise to an IIED claim. *Patton*, 118
2   Ariz. at 476.

3   Plaintiff also claims, however, that when a potential employer called Defendant to
4   check on his references, Defendant stated that Plaintiff "hurt one of their children." (Doc. 38
5   ¶ 166). Elsewhere in the IIED claim, Plaintiff states that Defendant accused Plaintiff of
6   committing crimes against children and that "plaintiff's name was used in reference to the
7   disgusting act/crime that [Defendant] accused [Plaintiff] of." (Doc. 138 ¶ 165). Defendant
8   again states that "Plaintiff states no facts concerning the alleged statement made by
9   Defendant or how the alleged statement is translated to a crime against children." (Doc. 39
10  at 12). Reading the complaint generously, as the Court must because Plaintiff is proceeding
11  pro se, it alleges that when Plaintiff's employment agency called a potential employer on
12  April 25, 2011, the potential employer stated that Defendant had reported to the employer
13  that Plaintiff had harmed Defendant's children. It alleges that Defendant made this allegation
14  knowing that it was false, solely to ensure that the potential employer would not hire
15  Plaintiff. Such behavior is not properly categorized as being "in the employment context."
16  *Mintz*, 183 Ariz. at 554. If the allegation is true, Defendant not only falsely accused Plaintiff
17  of a crime to prevent him from being hired, he falsely portrayed his own children as crime
18  victims to the same end. Such allegations, if true, adequately state a claim for IIED. Plaintiff
19  further alleges that Defendant was aware that he was susceptible to emotional distress and
20  that he did in fact suffer emotional distress, which he would ultimately need to prove to
21  succeed on this claim. *See Mintz*, 183 Ariz. at 553–54.

22  **H.   Plaintiff's Motion for Judicial Estoppel**

23  "Although [the Court] construe[s] pleadings liberally in their favor, pro se litigants are
24  bound by the rules of procedure." *Ghazali*, 46 F.3d at 54. Plaintiff has filed a number of
25  inappropriate motions in this matter. Plaintiff filed a Motion to Compel Answer on August
26  16, 2011, although Defendant had already been granted an extension to file his answer until
27  August 26, 2011. (Docs. 8–9). He filed a motion for default judgment against a party that had

28
- 12 -

1 not been properly served, and another motion for default judgment against a party who had
2 a motion to dismiss pending. (Docs. 13–14). He filed notices of constitutional challenge,
3 challenging the constitutionality of Rule 12(b)(6) and Arizona Rule of Civil Procedure 12.
4 (Docs. 30, 35).

5 Plaintiff has now filed a "Motion for Judicial Estoppel" claiming that Defendant has
6 taken contradictory positions in some of his briefings, and arguing that the motion to dismiss
7 is inordinately delaying resolution of this matter. (Doc. 44). Judicial estoppel "generally
8 prevents a party from prevailing in one phase of a case on an argument and then relying on
9 a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S.
10 742, 549 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 217, n.8 (2000)). The Court has
11 examined the briefings that Plaintiff has referenced, and notes that the arguments in them are
12 not contradictory. Even if they were, parties are not barred from making arguments in the
13 alternative in their briefing papers; judicial estoppel is only applicable when a party "has
14 succeeded in persuading a court to accept that party's earlier position." *New Hampshire*, 532
15 U.S. at 750. It is inappropriate to invoke judicial estoppel at this juncture, and Plaintiff's
16 motion is denied.

**CONCLUSION**

18 Plaintiff has alleged facts from which a reasonable employee would assume his
19 contract included vacation pay, so Claim Three survives. Claims Five through Seven are
20 dismissed because the Arizona theft statute provides no private right of action and the claims
21 for fraud and for aiding and abetting are untimely. Plaintiff has adequately alleged, for
22 purposes of surviving a motion to dismiss, that Defendant, hoping to deny Plaintiff future
23 employment, told a prospective employer that Plaintiff had harmed Defendant's children
24 while working for Defendant, even though Defendant knew that Plaintiff had not. Claims
25 Eight and Nine therefore survive, as does Claim Ten to the extent that it relies upon this
26 allegation.

27 Plaintiff's motion for judicial estoppel is denied and Plaintiff is advised that he must

- 13 -

follow the rules of procedure.

**IT IS THEREFORE ORDERED:**

1. Defendant's Motion to Dismiss (Doc. 39) is **granted in part and denied in part**.

2. Counts Five, Six, and Seven are **dismissed**.

3. Counts Five, Eight, and Nine survive.

4. Count Ten is **dismissed** with regards to the allegations of employment conditions, and survives with regards to the allegation that Defendant told a potential employer that Plaintiff had harmed Defendant's children.

5. Plaintiff's Motion for Judicial Estoppel (Doc. 44) is **denied**.

DATED this 17th day of April, 2012.

*A. Murray Snow*
G. Murray Snow
United States District Judge

- 14 -